Next case on the docket is 5-13-0207 Shearer v. Dr. S.A.R.M.A. Sarma. Counsel may proceed. Thank you. May it please the court, counsel, I'm James Brandenburg. I represent the appellate plaintiff in this matter. We're here asking the court to reverse the trial court's order granting summary judgment in favor of Sarma. The court ruled that Sarma owed her patient, Sarah, no duty of care. In doing so, the court relied on Eckhardt, which said that you have to have, one, they have to be a patient. There has to be a doctor-patient relationship, and two, you have to have a specific threat against a specific individual. We assert that the duty that arose between Sarah and Dr. Sarma was that Sarma comes from that physician-patient relationship itself, and that Dr. Sarma had a duty to exercise the same degree of knowledge, skill, and care that a reasonably qualified psychiatrist would use under the circumstances. We have also alleged that in our complaint. We assert that this isn't just a third-party duty to warn case, which is what the Eckhardt court dealt with, but rather, like I said, that the threat, the duty arises from that direct doctor-patient relationship. Now, Dr. Sarma was both Jacob and Sarah's psychiatrist. They went through the mental health clinic, the county mental health clinic in Montgomery County, and Dr. Sarma oversaw their overall care. Our expert alleged, or testified, that Dr. Sarma failed to establish protocols that she be notified when Jacob was off his medicine. Jacob was off his Plazeril for approximately 30-some days prior to stabbing and killing Sarah. The family, both Jacob's family and Sarah's family, was reaching out to help. Both families were contacting the mental health clinic. They notified the mental health clinic that Jacob had been off his medicine. There are facts that Jacob had threatened Sarah's mother, made a physical threat against Sarah's mother, and that he thought that Sarah was having an affair. Our expert, Dr. Lieberman, testified that when she first learned that two of her patients were getting married, she should have sat them down in joint counseling because this change in Jacob's life would be a stressor to his mental illness. She was aware that there was a prior time before Jacob was on Plazeril where he had heard hallucinations of voices telling him that he was gay and that he was having issues with, I guess, his manhood. Now, Dr. Lieberman, our expert, testified that that was a warning sign that once Jacob, and prior to killing Sarah, when he was off his medication, Jacob was again hearing these voices and ultimately killed Sarah because he thought that she thought he was gay and he was hearing those voices. Our expert testified that if Dr. Sarma would have been notified and had established protocols that she would be notified when Jacob was off his medication, that she could have called them in and learned this fact. And also, had she formed a proper therapeutic alliance with Jacob and Sarah, she would have, again, learned this fact. Go ahead, go ahead. You go ahead. So the defendant, the doctor, did not have actual notice that he was off his meds? Correct, correct. The mental health clinic did not. And what was the, it was a caseworker, wasn't it? What was her qualifications, do you know? Well, she was a nurse. Evidence came out that she had been fraudulently replacing her license with another nurse. She wasn't a licensed nurse, but she had training as a nurse. Interesting. You know, I'm really kind of, this case to me revolves more around kind of a new twist on duty because you're not saying, in some of the other cases like Ephardt and Tedrick, the duty there issue question arose out of the relationship between a part. Right, you need a special relationship. Right, you need a special relationship, or you need, which a husband-wife is not a special relationship, according to Tedrick, right? Right. Or you need, under Ephardt, you need at least prior actual threats of violence, and neither one of those apply, but you're saying that she had this duty to the victim here as a patient to warn. So really, you're going under just normal foreseeable duty issues, like Marshall v. Burger King and those cases where you look at whether or not it's foreseeable, and then you look at the policy questions, whether or not an act of a third-party criminal act would be foreseeable. Right, Judge, and I think, you know, the foreseeability question, there is a question of fact as to whether it's the proximate cause, but that's a question of fact, but the duty is the, you know, duty that you find in the IPI for professional negligence. Except for professional negligence, but generally that does not extend to criminal acts of third parties. Well. Under normal duty analysis. Correct. You know, I would argue, though, that it's not just the harm that has to be foreseeable, it's any harm to Sarah that Dr. Sarna should have reasonably foreseen. Sarah was reporting to the clinic that she was having problems in her marriage because Jacob was off his medication. She was crying. The family was reaching out to the clinic, other doctors. I mean, this was the family, this was a family, both Jacob's parents and Sarah's parents, who were very involved in their lives. I gather, yeah. And they were reaching out to anybody that was trying to seek help for Jacob because they knew that this was a very serious issue, that he was off his medications. So what we have, or what our expert has opined that because these protocols were set up between Dr. Sarna and the clinic, that she be notified when there's a change in her patient's condition, that she could have, you know, at the least testified to Sarah, you know, not necessarily warned him, you know, you're going, you know, I'm worried he's going to stab you, but, you know, could have said that she had been staying with her mother for a while prior. Say, you know, until we get his medicine managed and he's, you know, back on it, why don't you stay with your mother if it's causing you unhappiness in your, you know, marriage right now because you were happy when he was, you know, maintained on his medicine. You know, I think, you know, the Eckhart case is, you know, against us, obviously, you know, and says that you need that specific threat to a third party before you can be warned. You know, I would argue that maybe this is a type of case where because there was the, because she had knowledge of his prior paranoia with hearing voices, you know, that he was gay, and with his prior propensity for violence when he was off his medication. And is that in the record that he had a propensity for violence? Because I didn't see it if there was, and I looked for that, but maybe I'm wrong. I believe it would be in Dr. Lieberman's. I know that his family, he was hearing voices, I think, when he was around 14 years old, and his family had him hospitalized. There's also, you know, in looking at the fact that he had made a threat towards Janice Shearer and that he thought that Sarah was having an affair, that even without that specific threat, there may have been enough here, you know, where there was a duty to warn, even without that specific threat. I don't know if the court is comfortable going there, but I think this is maybe a case that, you know, because with the Epcot, what the issue is, is, you know, and what the court struggled with, is where do you draw that line? I mean, imagine, you know, somebody in Chicago goes off their medication, gets on an Amtrak train down to Dallas and stabs somebody. Obviously, there's no, you know, connection there that would give rise to the duty. But I think this case is a little bit different where you have joint patients, you know, and a history, you know, to where maybe it could be distinguished from Epcot. So what about Tedra? And I wrote that case and got reversed, so I'm pretty familiar with that. The Supreme Court didn't buy it. Right. Well, I mean, I know that, you know, life isn't this, you know, they don't recognize the special relationship. But, you know, here again we have the added fact that, you know, Sarah was a patient. Was a patient. And Tedra, as I recall, the wife actually went to the clinic, though, with her mother, and said, look, he's threatening to kill me. And they held her, you know, with no duty to warn or protect. You know, I see this struggle with that. It's really hard for me to address. You know, the final point I'll make is under Sitlis, there, you know, Sitlis found that there was a voluntary undertaking. I think that here Dr. Sarna testified that she undertook a duty to protect Sarah. She knew or should have known that they were living together. And just like in Sitlis, you know, I think an argument could be made that she undertook to make certain Sarah was in a comfortable surrounding at home, meaning that, you know, she was her patient. And when she realized or should have realized that, you know, that Jacob was having this trouble, you know, even, and I know that Dr. Sarna brings up confidentiality. She didn't necessarily, number one, she could have had that waived, and they were both in joint counseling sessions in the days before. But number two, she didn't necessarily have to breach the confidentiality with Jacob. She could have simply, you know, knowing what she knew about Jacob's history, she could have said to Sarah, again, you know, why don't you go stay with your mother for a while or get yourself out of that situation until his medication gets managed. I want to ask you a clarification. Lieberman was whom? Was he the prior therapist or was he the medical doctor? Dr. Lieberman is our controlled expert. Oh, okay. There was a, he saw a medical doctor, and didn't he put him back on meds shortly before he went for his counseling session? Right. I think he had been on medications for a few days prior, but they hadn't, they take time to. And was that brought out? I mean, with Lieberman, your expert, was that brought out that he wouldn't have had the full effect of his medication by the time that the incident happened? You know, I don't recall specifically, but I mean it's, I think there's no dispute that this medication takes time to build up in your system before it's, you know, effective. And there's, you know, no question that Jacob was, you know, psychotic at the time that he killed his wife. If there's no further questions. Thank you, counsel. Thank you. May I please support the case? It's my privilege to represent Dr. J. Sarna for her honors today. And I will start exactly where her honor left off. Yes, Jacob was seen by a family practitioner on January 7th, and that was Dr. Byers, B-Y-E-R-S. And in Dr. Byers' note, which is a part of the record, as well as his testimony in his deposition, they had worked out a plan where he would resume his glossary with his mother, who was also a nurse practitioner, who was also present. So on the 7th, that visit did occur, that arrangement was, in fact, made on the 7th, three days before the tragedy that unfolded. And the second part of your question, the answer is no. Dr. Lieberman did not recline. Dr. Lieberman, of course, being a famous retained control expert, Dr. Lieberman did not recline. There's no evidence how long it would take for him to be back in the therapeutic range. Actually, there is no known therapeutic range for glossary. That's why they don't do a blood draw specific for the amount of glossary in the bloodstream. The blood draws that you saw referenced were for known side effects of Clauseril, which is a granulocytosis, which is the body producing too many white blood cells, if I remember right. But backing up a little bit now that I've tried to answer that, those questions of the court, counsel made mention of the existence of protocols. First of all, a lot of what I heard here today about Dr. Lieberman and her testimony goes to whether or not there was a breach of the standard of care. It doesn't go to whether or not there was a duty to begin with. And I would submit that trial court got it exactly right. There was no duty. Dr. Lieberman can't create a duty. That's up to the courts of Illinois. And I cited in our brief to the Reynolds case, fourth district case out of Decatur, Illinois, that says an expert can't irrigate themselves. It's a medical malpractice case, too. An expert can't irrigate themselves to presuming to create a duty. That's the job of the courts, not the job of a high-level expert. She can give testimony, I guess, with respect to whether something would be foreseeable for a psychiatric patient that is not taking his meds and is psychotic and that type of thing, which can be considered as part of the duty analysis as to whether or not it would be foreseeable for someone that was schizophrenic to be in the type of mental state he would be in and potentially dangerous if he weren't taking his meds. An expert can opine, I suppose, on that aspect of foreseeability for what it's worth. For what it's worth. But Eckert says it's not worth anything, explicitly says it's not worth anything. So going back to my point about Dr. Lieberman can't establish the duty, that's what the courts are for. The protocol argument that I've heard is the same thing. The protocol is evidence of what the standard of care was, not the existence of a duty. And the protocol at issue here is basically to communicate it. Everybody knew that that's what's required. Every nursing student knows that when there's a change in a patient's condition, you communicate that to the physician. That's what Martha Benning, the caseworker here, with about 20 years of experience in the industry that she had, forged her license for a number of years. She did a 20-year experience at this job. She testified, she knows when there's a change in a patient's condition, you communicate that to the physician. Dr. Sargent testified, I would expect a phone call if there's a change in a patient's condition. That's what the standard of care is. The protocol isn't anything more than that. It's not some massive piece of paper that creates a duty. It only documents what the standard of care is. But I still think that standard of care has some bearing on the duty analysis because it does go to foreseeability. I'm thinking of the Burger King language, I think it's Burger King, where they talk about a duty is owed where the parties are in such a relationship that we view public policy that one party owes a conduct of reasonable care to the other. So I would think that how psychiatrists go about their conducting themselves in their profession would have some bearing on that, whether or not they stand in a relationship that would bring on that duty. I'm not saying that it's the entire duty analysis. It's just a portion that is something that we have to consider when we think of what is reasonably foreseeable. You don't agree? Well, I agree it is a broad principle, yes, Your Honor. But isn't duty analysis a broad principle? Well, I think that there are broad general duties, such as the specialist's duty to exercise reasonable care under the circumstances treating a patient as a reasonably careful or qualified physician, but doing it under the same circumstances. I think that is a broad duty. I think there are more specific duties, and the more specific duties are what bring us here today. There's no allegation that, and it was never an issue, that Dr. Sarma was negligent in her diagnosis or treatment of Sarah Shirer-Ott. That's not an issue in the case. She had a duty to diagnose her. She had a duty to treat her. Evidently, there's no qualm with that because it wasn't alleged as a breach, and it wasn't alleged as somehow approximately cause for death. But when – and here's where the trial court, I think, got it right. We're looking at more specific duties, such as the duty to warn. And Eckert is absolutely – counsel struggled with dealing with Eckert, and appropriately so. They admitted here, they admitted in the trial court, that there was no evidence of a specific threat of harm directed by Jacob to Sarah. It didn't exist. Everybody has family members that's closely involved with their children. Nobody heard that, much less is there any evidence that it was communicated to Dr. Sarma. So the more specific duty inquiry, say, for example, of a duty to warn, requires those facts to be in existence, and that's where the trial court got it right. Now, we heard Eckert trying to be distinguished based on the idea, well, it dealt with a third-party nonpatient situation. But the third element of Eckert makes it clear that it applies to co-patients or nonpatient third parties. The third element says there has to be a relationship between the physician and the victim. They would be a patient, or a special relationship between the victim and the patient. So it deals with both scenarios. Eckert applies to both scenarios by its own terms. That's an element of that duty. Absent that element, there's no duty to warn. In other words, there's no duty, there's no obligation for Dr. Sarma to breach her confidentiality with Jacob. And that's what really is at the crux of this case. That's what they continually run up against is the duty set by two or three statutes in Illinois that I've cited in our brief that prevent Dr. Sarma from providing a warning or educating Sarah about Jacob's condition. She can't. Ethically, legally, she's banned. I probably should have asked Tim, but at least on the last visit with the caseworker, whoever she was, they were all in there together. Was that unusual, or did they have co-therapy sessions? Martha Benny is the caseworker. So Sarah and Jacob, from what I read in the briefs, were in a session together. Correct. Was that unusual, or did that go on before? Because that certainly would have an impact on whether or not there was a breach or a waiver of confidentiality.  They can be in the room together and be discussing whatever problems they may jointly be having. That doesn't necessarily mean Jacob waives letting Sarah or Sarah's mother know about his mental health diagnosis. I reread Jan Shearer, Sarah's mother's deposition, a couple of nights ago, and she said something that struck me as very interesting. I asked her, when did you learn that Jacob carried these mental health diagnoses? And she testified, I learned about it in December 2003 or January 2004, as these events are unfolding. Now this is a situation where Sarah and Jacob had been dating for a year, and she testified also that Jacob was at their house basically every day for that year. Evidently, Jacob wanted to maintain his confidentiality. And he's entitled to do that. Dr. Sarma, whatever is said in that session, doesn't have the authorization to disclose his mental health care conditions. I don't know what was said in that session with Martha Benning. I don't, I do, the court is correct that they were both in there. I don't know what they were discussing. Dr. Sarma wasn't there. No, I'm wondering if there were, if there was a history of them being treated together with Dr. Sarma. Dr. Sarma testified that it was her recollection that she had met them both on one occasion at the same time. That does not, and that was a vague recollection, but that was her testimony in her deposition. But if I'm understanding where the court is going, I think it's the notion that, well, does the presence of the third party create a waiver like it might in the attorney-client confidentiality issue? The answer to that is no. The presence of a third party with respect to a confidentiality act is mental health records. Mental health conditions does not, there's no corollary in mental health privilege. And do you believe that that applies to sessions where the treater is actually providing treatment to two people at the same time? Well, I believe, Your Honor, that it is. And I'm not sure about this. I'm asking you, because I do see a big difference between telling the mother something who is not a patient and happened to be in the session and actually treating two patients together. Well, I think actually treating two patients simultaneously, you're not addressing their separate mental health issues. You're addressing their joint relational issues. If they're in it together, that's family therapy, not psychiatric care being delivered to each of them separately. That's the difference that I see. If that answers the court's question. Thank you. We heard a little bit about the duty to protect. And I'm very cognizant that you wrote the opinion in Tedrick and it went up to the Supreme Court. The court made what I thought were some very insightful and useful observations. We know that the duty to protect, which arises in this case under Section 323 of the Restatement of Torts, duty to protect has never been applied in a malpractice case, ever. And that goes back to Kirk, which was decided by the Supreme Court in 1987, and up to Tedrick, which was decided in 2009. So we have a couple of decades of jurisprudence that says we are not going to extend the duty to protect into the malpractice arena. In fact, as I'm sure the court's aware, Tedrick distinguished the case principally relied on by the plaintiff, Sickless v. Ecker, on the basis that it was not a medical malpractice case. Usually the duty to protect only applies in the four usual situations. Inmate, innkeeper, guest, common carrier, possessor of land, invitee, and custodial situations, custodial, inmate type of situations, the word is escaping me at the moment. It's never been extended to the physician-patient relationship. There's no, there's absolutely no authority for that. And what we needed to see is some kind of analysis by a plaintiff in this case, submitting this case to a duty analysis before we can reach the conclusion that a duty to protect under the circumstances exists. And that's absent. Anything in the record that your client knew or should have known that Jacob was a violent person? Or is there anything that he was a violent person? You know, you would have to search the record very, very hard to find any reference to Jacob acting in a violent manner from the time he was a teenager up to the present. I think, my vague recollection is there was some testimony of some verbal altercation with his mother before he started receiving treatment. And quite candidly, I consider it a little bit of an unfortunate commentary that we are asked to simply swallow the notion that if a mental health patient doesn't get their medicine, they're immediately violent and uncontrollable. I chafe at that notion. There's enough stigmata attached to mental illness in our society for us to stand in front of a jury and present the argument that, well, of course he was violent. He was mentally ill and he didn't get his medicine. I think that the court's point about taking the officer's record is extremely hard before you can find any significant record of a history of violence directed at anybody by Jacob Ott. So, sick list. Going back to the duty to protect Sarah based on the physician-patient relationship between Sarah and Dr. Sarma. It's a duty to protect someone from an increased risk of harm. I would submit to this court that the foreseeability analysis for a duty to protect under the circumstances would be the same as it would for a duty to warrant under Eckert. Meaning there would have to be a specific threat of harm directed at a specific individual before it could be even conceivable that a duty to protect could arise. Because a duty to protect implies a need to break confidentiality to take some action to protect the other person. And before that can happen, by statute, there has to be an imminent risk of harm. And that is completely absent, as counsel quite candidly admitted in an oral argument in the lower court. So for those reasons, I think the trial court absolutely got it right. I did not go through the various other relationships that they allege in their Sixth Amendment complaint that gave rise, possibly gave rise, to various duties. Because I think that their briefs have acknowledged that it doesn't bear that out. And I think our briefs make it pretty clear that those duties don't exist. I think the trial court got it exactly right that the duty that they claim is not supported by the facts or the law under these circumstances. Thank you. Thank you, counsel. You're welcome. You know, I would say the duty that Dr. Sarna had to Sarah, it's inherent in the relationship. It's inherent in the physician-patient relationship. We're not simply dealing here with a duty to warn. There's a lot of additional evidence being presented. In our Sixth Amendment complaint, paragraph 113, we allege defendants breached the above standards of care by negligently treating Sarah in one or more of the following ways. We are talking about treatment that Dr. Sarna provided to Sarah, not simply the fact that she failed to warn her of the threat that Jacob posed to her. As far as the question about previous violence, I believe there was an episode where he was violent against his stepmother when he was around 14 before he got – and he was hospitalized for a period. Then there was also an episode where he made a threat in the days before Sarah's death towards Sarah's mother. And did Dr. Sarna – would – do you believe that Dr. Sarna would have had that knowledge of those incidents? Well, no, she didn't. But what our expert testified to is essentially Dr. Sarna was just running in and out of her. She wasn't spending enough time with these patients. She didn't have the protocols that she'd be notified. And this is a serious change in an individual's condition. He's been off this medication for, you know, over 30 days, and he was, you know, having, you know, hallucinations there within the clinic. There's in the record that he was, you know, quote, unquote, preoccupied. And what our expert says is that that means he's having hallucinations at that point. I believe he showed up, you know, wet to the clinic one time, his clothes all wet. You know, he thought he had won an island. He thought, you know, just he was having all these delusional thoughts. And our expert says that, you know, that one of the, you know, breaches of Dr. Sarna's duty was that she not set up the protocol that she'd be notified. You know, as far as the comment regarding confidentiality, I think I already addressed this. But Dr. – our expert said that Dr. Sarna should have insisted that Jacob waive confidentiality or else stop that, say that she could no longer treat one of them. Now, the – and finally, you know, Dr. Sarna did not need to break any confidentiality that she had with Jacob. She could have simply said, you know, because you're having, you know, problems in your relationship right now. And Sarah was in there crying in the clinic. She was, you know, telling Martha Beck about these problems. She could have simply, you know, with what she knew, you know, in her treatment of Jacob and Jacob's history, she didn't have to disclose that. She could have simply said, why don't you go stay with your mother for a while until your relationship gets better. So I don't think – you know, I think the confidentiality is, you know, a little bit of a red herring that it's not necessarily there. If there's no further questions. No further questions. Thank you, counsel. Thank you, counsel. Okay, so we've taken that advisement. You've been notified, of course. And the court will recess, adjourn, I guess. The recess is still July. Thank you. All rise.